UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MASON TENDERS DISTRICT COUNCIL
WELFARE FUND, et al.,

                              Plaintiffs,

              -against-

BLADE CONTRACTING, INC., et al.,

                              Defendants.

---

22-CV-9609 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

This is a case of unpaid benefit contributions, contracts, and allegedly conflicting

obligations. Plaintiffs, which are a series of labor-management funds, have brought this action to

collect unpaid benefit contributions from Defendants. The Mason Tenders Union executed a

collective bargaining agreement with Defendant Blade Contracting, Inc., a for-profit contractor

in the construction industry, in September 2006. The agreement imposed various requirements on

Blade Contracting, including making fringe benefit contributions to the Plaintiffs for the benefit

of the Mason Tenders Union. The contributions were to be based on the number of hours Blade

Contracting employees conducted masonry and construction work in the New York City area.

For one such project—a 2018 project in Brooklyn to construct a 145-unit residential building

intended for senior housing—Blade Contracting utilized their own employees, trade workers

from the Mason Tenders Union, and also hired low-income local hires pursuant to 12 U.S.C. §

1701u. These local hires were to be paid prevailing wages and supplemental benefits as dictated

by New York Labor Law. Defendants paid these local hires in cash and accordingly did not make

benefit contributions to the Plaintiffs' funds as required by the collective bargaining agreement.

After the Mason Tenders Union conducted an audit of Blade Contracting's books, they

discovered a balance of unpaid benefit contributions for those local hires and demanded that

Blade Contracting pay the outstanding balance of approximately $200,000. Blade Contracting explained they did not make these contributions because, they claim, doing so would have violated New York Labor Law requiring direct payments to any prevailing wage workers. Plaintiffs filed this litigation shortly thereafter, and during the pendency of this litigation, Defendants have paid approximately $50,000 towards the unpaid delinquent balance. The instant motions concern the remaining balance, as well as accrued interest, liquidated damages, and other costs and fees.

Plaintiffs and Defendants have both filed summary judgment motions. Defendants argue they were not required to make contributions for the local hires they employed, and that doing so would have violated federal and state law. They also contend that in any event, Plaintiffs have no grounds to assert their claims because they knew of Defendants' allegedly breaching conduct for years and did nothing. Plaintiffs, on the other hand, seek summary judgment on all their claims, arguing that Blade Contracting's obligations under the collective bargaining agreement did not conflict with New York Labor Law, that Defendants can be considered a single entity for liability and damages purposes, and that the affirmative defenses that Defendants seek to invoke are not available in ERISA actions like this one.

As set forth below, the Court DENIES Defendants' motion and GRANTS Plaintiffs' motion, finding they are entitled to damages under the collective bargaining agreement and the Employee Retirement Income Security Act. The evidence makes clear that Blade Contracting, by complying with their obligations under the collective bargaining agreement, would not have violated applicable law. Further, Defendants' attempt to invoke the doctrines of waiver and estoppel to dismiss Plaintiffs' claims also fails, because the Second Circuit has held they are not available defenses in Section 515 ERISA actions like this one.

However, while the Court concludes Plaintiffs are entitled to damages, Plaintiffs must submit new damages calculations for the Court's consideration because the current estimates include conduct from before 2017, which falls outside the applicable statute of limitations.

## BACKGROUND

Unless otherwise indicated, the Court only cites a 56.1 statement where (1) the parties have agreed the factual assertion is undisputed; and (2) the factual assertion is properly supported by a citation to the record. This includes instances where a party does not truly "dispute" an assertion, but merely seeks to qualify or add their own "spin" to it. *See Kaye v. New York City Health and Hosps. Corp.*, No. 18-CV-12137 (JPC), 2023 WL 2745556, at *2 n.2 (S.D.N.Y. Mar. 31, 2023). The Court otherwise cites to the exhibits filed by the parties in connection with the instant motions, and any relevant pleadings in this case. *Id.*

### I.     Factual Background

Plaintiffs Mason Tenders District Council Welfare Fund, Mason Tenders District Council Pension Fund, Mason Tenders District Council Annuity Fund, Mason Tenders District Council Training Fund, Mason Tenders District Council Health and Safety Fund (collectively, the "Funds") are a series of multi-employer, labor-management trust funds established and maintained pursuant to various collective bargaining agreements ("CBAs") and trust agreements in accordance with Sections 302(c)(5) and (c)(6) of the Labor Management Relations Act of 1947 ("Taft-Hartley Act"), as codified at 29 U.S.C. §§ 186(c)(5) and (c)(6). ECF No. 69 ("Joint SMF") ¶ 1; ECF No. 55 ("Pls. 56.1") ¶ 1. The Funds provide certain benefits (such as retirement, vacation, and training) to members of the Mason Tenders District Council of Greater New York (the "Union" or the "Mason Tenders Union") and their eligible dependents. Joint SMF ¶ 2. Employees are eligible for benefits when their respective employers contribute to the Funds

pursuant to a CBA. *Id.* The Funds are also third-party beneficiaries of collective bargaining agreements between employers and the Union. Pls. 56.1 ¶ 3.

Blade Contracting Inc. ("Blade Contracting") and Blade General Contracting Inc. ("Blade GC," and together with Blade Contracting, "Defendants") are for-profit contractors that operate in the construction industry in and around New York City. Joint SMF ¶¶ 3–6. Defendants are separate entities, though there is evidence the two share some operations. For instance, Blade Contracting and Blade GC use the same third-party payroll processing company, share common yard space and office space, and occasionally share employees (Blade GC employees occasionally perform work for Blade Contracting construction projects). *Id.* ¶¶ 16–20. Blade Contracting and Blade GC have also defended this action jointly. For example, James Lerie appeared on behalf of both entities for a deposition. *Id.* ¶¶ 7–9. In addition, while Lerie was a field supervisor for Blade GC, he would also act as a field supervisor for Blade Contracting construction projects. *Id.* ¶¶ 13–14.

### A. Key Contracts & Agreements: The Master CBA & the Outlets PLA

On or about September 27, 2006, Blade Contracting and the Mason Tenders Union entered into the "Mason Tenders District Council of Greater New York Master Independent Collective Bargaining Agreement with the Mason Tenders Union" (the "Master CBA"). Joint SMF ¶ 21; *see* ECF No. 51-2. The Master CBA defines the Mason Tenders Union's geographic jurisdiction as "all jobs in Greater New York City within its established boundaries." Joint SMF ¶ 22. It further defines the Mason Tenders Union's trade jurisdiction as covering a wide array of masonry and construction work. *Id.* ¶ 23. The Master CBA requires that Blade Contracting recognize the Mason Tenders Union as the exclusive collective bargaining agent for all employees. ECF No. 51-2, Art. I § 1 (at PLAINTIFFS 0002).

The Master CBA provided that all employees of Blade Contracting shall become and remain members of the Union. ECF No. 51-2, Art. III § 1 (at PLAINTIFFS 0004). The Master CBA required Blade Contracting to make weekly fringe benefit contributions to the Funds based on the number of hours of work performed by their employees. Pls. 56.1 ¶ 30. Blade Contracting was required to submit reports along with these contributions. ECF No. 51-2, Art. VI § 15(j) (at PLAINTIFFS 0014). The Master CBA provides that if an audit of Blade Contracting books and records reveals a delinquency that is greater than 10% of the contributions paid to the Funds during the period covered by the audit, then Blade Contracting would be considered "substantially delinquent" and liable for certain costs. ECF No. 51-2, Art. VI § 17(d) (at PLAINTIFFS 0015).

The Master CBA also required Blade Contracting to, among other things: (i) permit the Funds (or their designated representatives) to audit Blade Contracting's books and records (Joint SMF ¶ 24); (ii) apply interest[1] and other fees and costs on delinquent fringe benefit contributions (*id.* ¶ 25); and (iii) in the event of a judgment of delinquent fringe contributions, pay the unpaid contributions with interest, in addition to any other relief (*id.* ¶ 26). The Master CBA renews year to year unless either party gives written notice to terminate. *Id.* ¶ 27. To date, no party to the Master CBA has given any such notice. *Id.* ¶ 28.

On or about March 8, 2017, Blade GC signed a Letter of Assent ("LOA") to be bound by the Staten Island Empire Outlets, Project Labor Agreement ("Outlets PLA"). Joint SMF ¶ 29. Similar to the Master CBA, under the Outlets PLA, Blade GC must make contributions to the Funds, deduct certain dues, and comply with other terms specified in the Agreement for all

---

[1] Interest accrued from the date each monthly contribution was due (15th day of the month following the month in which the work for which such contributions are due was performed). Pls. 56.1 ¶ 35.

Covered Work on the Staten Island Empire Outlets project (the "Outlets Project"). *Id.* ¶ 30. The PLA specified four sectors for the Outlets Project: Retail, Garage/Foundation, Hospitality, and Infrastructure. *Id.* ¶ 31. Related to this project, Blade Contracting entered into a subcontract with Empire Builders LLC to perform work on the Retail and Garage Sectors of the Outlets Project. *Id.* ¶¶ 33–34. Blade Contracting submitted multiple applications and certificates for payment for work performed on the Garage and Retail Sections of the Outlets Project. *Id.* ¶¶ 36, 37.

### B.  The Ingersoll Housing Project

Blade Contracting signed a contract with Ingersoll Builders Inc., dated January 30, 2018 (the "Ingersoll Contract"), to perform work on a 17-story, 145-unit, low-income senior housing project for the New York City Housing Authority ("NYCHA") located in Brooklyn (the "Ingersoll Housing Project" or the "Project"). *Id.* ¶ 49. The Ingersoll Contract scope of work included "all masonry and block work, furnishing and installation of all brick and block, installation of exterior insulation and air weather barrier, vertical expansion joints, and installation of lintels and angles." Joint SMF ¶ 56. Neither Plaintiffs nor the Mason Tenders Union were signatories to the Ingersoll Contract. Joint SMF ¶ 55.

The Ingersoll Contract required Blade Contracting to comply with certain state and federal regulations and requirements:

  i.  Section 3 of the Housing and Urban Development Act of 1968, codified at 12 U.S.C. §1701u, required Blade Contracting to employ "low and very low-income persons" in performing work for the Ingersoll Housing Project (because it was a federally assisted project) and to satisfy all implementation requirements as a federally funded project. Joint SMF ¶ 51; ECF No. 51-8 at BLADE1323–24.

  ii. The "Prevailing Wage Project," stemming from the Davis-Bacon Act (codified at 40 U.S.C. § 3141, *et seq.*), required Blade Contracting to pay wages in accordance

6

> with the "prevailing wage table" which specified hourly rates, overtime and
> holiday rates, and fringe benefits. ECF No. 51-8 at BLADE 1327, BLADE 1337–
> 51. Blade Contracting was also required to, among other things, submit certified
> payrolls on a bi-weekly basis and allow city inspectors to audit their compliance.
> *Id.* at BLADE 1327.

The Ingersoll Contract instructed Blade Contracting to adhere to "key items of Prevailing Wage Compliance," and warned that strict adherence was required or else Blade Contracting would face contract termination or "serious fines" from the Department of Labor. Joint SMF ¶ 52. Only laborers and bricklayers were employed as trades for the project. *Id.* ¶ 58.

Members of the Mason Tenders Union worked on the Ingersoll Housing Project and had a Shop Steward to record the union workers' attendance and work. *Id.* ¶¶ 53, 54. Per the Master CBA, the "Shop Steward" is tasked with monitoring Blade Contracting's compliance with the Master CBA, and in the event the Shop Steward becomes aware of non-compliance, they are to inform the local union that appointed them. ECF No. 51-2, Art. VIII § 1(a) (at PLAINTIFFS 0018). Defendants have provided evidence the Shop Steward also recorded the Mason Tenders Union workers' attendance and hours on the Ingersoll Project. ECF No. 56-7. Defendants submitted remittance reports to the Mason Tenders Union when they paid contributions for the union workers. ECF No. 56-8.

Defendants also had their own employees perform work for the project, in addition to hiring low-income local laborers (the "Local Hires") pursuant to the Ingersoll Contract's terms. *Id.* ¶¶ 57–61; ECF No. 56-6 at 73:5–16. Defendants testified that they did not negotiate a separate agreement with the Mason Tenders Union regarding local hires beyond the existing Master CBA. Joint SMF ¶ 65. Defendants testified that the Mason Tenders Union Shop Steward

did not file any grievances against Defendants or otherwise indicate anything was wrong with the Local Hires, despite the Shop Steward being "on the job." ECF No. 51-13 at 112:24–113:18. Defendants also asked the Mason Tenders Union Shop Steward if the Union would sign up the Local Hires to make them part of the Mason Tenders Union, but the Union indicated they would not sign them up. Joint SMF ¶ 66. Defendants testified they never had any dealings with the Funds' office. *Id.* ¶ 68. Defendants submitted certified payroll reports for work performed on the Ingersoll Project. *Id.* ¶¶ 38, 62–64. The report included a worker's classification and number of hours worked for all laborers, union workers, and the Local Hires. *Id.*

### C.  Audit of Blade Contracting and Blade GC's Books and Records & Subsequent Payments

As a general practice, the Funds retained independent auditors Schultheis & Panettieri LLP ("S&P") to inspect an employer's book and records to determine whether the employer was making the necessary contributions under the collective bargaining agreements. Joint SMF ¶ 39. In their work for the Funds, S&P employs procedures in accordance with the American Institute of Certified Public Accountants. Pls. 56.1 ¶ 49.

S&P conducted a payroll audit of Blade Contracting and Blade GC's books (the "Blade Audit") for the period from January 1, 2016 through March 28, 2021. Pls. 56.1 ¶ 50. The Blade Audit found several Mason Tenders Union workers contributed to and worked on the Ingersoll Housing Project. *Id.* ¶¶ 165–183. S&P identified a number of contribution underpayments, ranging from a few dollars (*id.* ¶ 66) to a few thousand dollars (*id.* ¶ 130). *See generally id.* ¶¶ 64–164. After receiving the Blade Audit, Blade Contracting sent relevant portions of the Ingersoll Contract to S&P. ECF No. 56-1 ¶¶ 12–13. Defendants contend in this litigation that any alleged underpayments prior to November 10, 2017 are no longer applicable because they fall outside the applicable statute of limitations. ECF No. 61 ¶ 3.

S&P found a total deficiency of $217,256.41 in fringe benefit contributions, dues

checkoffs and PAC contributions, and a credit of $14,172.60, yielding an alleged $203,083.81 of

net unpaid contributions for the relevant period. Joint SMF ¶¶ 40–42. On October 24, 2022, the

Funds, through their attorneys, demanded Defendants pay the unpaid contribution plus interest.

*Id.* ¶ 43. This litigation followed shortly thereafter.

After the commencement of this litigation, Defendants submitted two checks identifying

the S&P audit in the memo field: one check was for $33,450.26, and the second was for $18,

901.98. *Id.* ¶¶ 46–48. Thus, according to Plaintiffs, there remains an outstanding balance of

$150,731.57. Pls. 56.1 ¶ 63. Plaintiffs contend they are also owed accrued interest and liquidated

damages pursuant to the Master CBA. Pls. 56.1 ¶¶ 197–203.

## II.    Procedural History

Plaintiffs filed this action on November 10, 2022 pursuant to Sections 502(a)(3) and 515

of the Employee Retirement Income Security Act ("ERISA") (as amended 29 U.S.C.

§§1132(a)(3) and 1145), and Section 301 of the Taft-Hartley Act, for breach of contract[2],

injunctive relief, and other equitable relief. ECF No. 1. Blade Contracting was served on

November 17, 2022, with the answer due on December 8, 2022. ECF No. 7. After Blade

Contracting failed to appear or defend the action for several months, Plaintiffs sought entry of a

default judgment on February 23, 2023. ECF No. 14. On March 31, 2023, the parties stipulated

to vacate the entry of default and withdraw the motion without prejudice. ECF No. 26.

---

[2] Though Plaintiffs asserted state law breach of contract claims in their Amended Complaint, the instant motions appear to only rely on the ERISA claims, and so the Court will not consider the breach of contract claims and treat them as abandoned. *See, e.g., BWP Media USA Inc. v. Polyvore, Inc.*, No. 13-CV-7867 (RA), 2018 WL 11449489, at *1 (S.D.N.Y. Dec. 13, 2018) (finding it would have been proper to conclude Plaintiffs abandoned infringement claims where, among other things, they failed to mention them in opposing Defendant's motion or in their own cross-motion for summary judgment).

Plaintiffs filed an Amended Complaint on April 12, 2023 asserting identical claims and adding Blade GC as a defendant. ECF No. 27. Defendants filed an answer to the amended complaint on May 12, 2023. ECF No. 29. On May 3, 2024, and after completing discovery, the parties filed the instant cross motions for summary judgment. ECF Nos. 49, 50 ("Pls. Mem."), 56, 58 ("Defs. Mem.").

## LEGAL STANDARD

In considering cross-motions for summary judgment, a court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Jingrong v. Chinese Anti-Cult World All. Inc.,* 16 F.4th 47, 56 (2d Cir. 2021) (citing *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)). To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 22. If the movant meets its initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted).

When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the

suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)). "The function of the district court in considering [a] motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (internal quotation marks and citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (internal citation omitted).

## DISCUSSION

Section 515 of ERISA provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. Plaintiffs seek summary judgment, pursuant to Section 515, on all claims, arguing that (1) Defendants breached their obligations under the Master CBA; (2) Defendants owe damages as a result; and (3) Defendants are jointly and severally liable for the alleged delinquent contributions, as a single entity, on either a "single employer" or "alter ego" liability theory. Defendants seek dismissal of all Plaintiffs' claims arguing that (1) complying with the Master

11

CBA would have required them to violate federal and state law; and (2) alternatively, their non contributions are excused by the doctrines of waiver and estoppel.

This discussion proceeds in five sections. First, the Court determines that under the plain language of the Master CBA, the Local Hires were Blade Contracting's "employees," and therefore Blade Contracting had an obligation to make fringe benefit contributions to the Funds with respect to the work they performed on the Ingersoll Housing Project. Second, the Court finds that Section 220 of the New York Labor Law does not explicitly require cash payments to prevailing wage workers, and that the Master CBA did not require Defendants to violate state or federal law. Third, the Court finds that the affirmative defenses of equitable estoppel and waiver are not available or recognized defenses in an ERISA action like this one, and therefore rejects them. Fourth, the Court considers whether Blade Contracting and Blade GC are joint and severally liable for any damages, and concludes they are because Defendants have failed to adduce any evidence to create a genuine dispute of fact on this question. Finally, the Court considers Plaintiffs' asserted damages, and denies the current calculations, but instructs Plaintiffs to submit revised calculations in light of the fact that the current claimed damages do not exclude conduct prior to the applicable statute of limitations. Defendants will have an opportunity to respond to Plaintiffs' submission.

The Court therefore DENIES Defendants' motion for summary judgment, and GRANTS Plaintiffs' motion in part and DENIES it in part.

## I.    Blade Contracting Was Required to Make Fringe Contributions on Behalf of the Local Hires under the Master CBA

The Master CBA provided that all employees of Blade Contracting shall become and remain members of the Union. ECF No. 51-2, Art. III § 1 (at PLAINTIFFS 0004). The Master CBA also required Blade Contracting to make weekly fringe benefit contributions to the Funds

based on the number of hours of performed by Blade Contracting employees. Pls. 56.1 ¶ 30. Additionally, the Master CBA defined its jurisdictional scope as the Greater New York City area. Joint SMF ¶¶ 22, 23.

For the Ingersoll Contract, Blade Contracting utilized their own employees, laborers from the Mason Tenders Union, and they hired certain low-income local laborers (the Local Hires), pursuant to 12 U.S.C. § 1701u, as required by the Ingersoll Contract. *See* Joint SMF ¶¶ 50–51, 53. For the Local Hires, the Ingersoll Contract instructed Blade Contracting to pay them prevailing wages and supplemental benefits in accordance with New York Labor Law § 220. *Id.* ¶ 52. The parties do not appear to dispute that the Master CBA's scope covered the Ingersoll Project because it occurred in the geographical and trade jurisdiction of the Mason Tenders Union as expressed in the Master CBA—namely, masonry and construction work in the Greater New York City Area. Joint SMF ¶¶ 22, 23.

The relevant questions, then, are (1) whether the Local Hires were Blade Contracting's "employees" as contemplated by the Master CBA; (2) and, if so, whether Defendants were required to make fringe benefit contributions on their behalf. The Court addresses each issue in turn, concluding that the Local Hires were Blade Contracting's employees and Defendants were required to make contributions to the Funds with respect to the Local Hires.

### A.  Meaning of the Term "Employee" in the Master CBA

When interpreting a collective bargaining agreement, courts apply the traditional rules of contract interpretation, provided that they are consistent with fair labor policies. *Aeronautical Indus. Dist. Lodge v. United Techs. Corp*, 230 F.3d 569, 576 (2d Cir. 2000). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent, [and that] [t]he best evidence of what parties to a written agreement intend is what

they say in their writing." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002) (internal citations omitted). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (internal citation omitted). "Whether a contractual term is ambiguous must be determined by the court as a matter of law, looking solely to the plain language used by the parties within the four corners of the contract to discern its meaning and not to extrinsic sources. *Ashwood Cap., Inc. v. OTG Mgmt., Inc.*, 948 N.Y.S.2d 292, 297 (1st Dep't 2012).

The Master CBA does not explicitly define the term "employee," and so the Court will give the term its ordinary, plain meaning. An "employee" is a "person who works for an employer" or a "person employed for wages or a salary under an employment contract."[3] The plain reading of this term would include the Local Hires. Defendants have not disputed they were required to make fringe contributions for the other Blade Contracting employees who contributed the Ingersoll Project, but instead attempt to distinguish between them from the Local Hires who earned prevailing wages. But Defendants have not pointed to any provision of the Master CBA that makes a distinction between Blade Contracting employees performing "prevailing wage" work versus any other kind of work. Because the term "employee" in the contract is unambiguous, the term must be given effect as written. *See Bozetarnik v. Mahland*, 195 F.3d 77, 83 (2d Cir. 1999).

Still, Defendants attempt to argue the Local Hires do not qualify as their "employees" because they were "temporary hires" and "temporary placements" retained pursuant to the

---

[3] *Employee*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/employee_n1 (last visited March 1, 2025).

Ingersoll Contract hiring requirements. ECF No. 65 at 9, 10.[4] While the Ingersoll Contract instructed that Blade Contracting hire low-income laborers, it did not specify the basis by which those hires should be made. The Ingersoll Contract stated, among other things:

> Section 3 is an economic development program of HUD and is required on this project. It states that for 30% of your <u>new</u> hires, a good faith effort is made to hire directly from economically challenged communities such as public housing. In the case of Ingersoll Senior Houses, the economically challenged community will be the NYCHA developments surrounding the project site.

ECF No. 51-8 at BLADE1335. This provision provides no information on the employment status of the Local Hires, or specify the terms by which Blade Contracting was required to make any such hires. It also does not indicate that Defendants were to hire the Local Hires on only a temporary basis. In short, Defendants have failed to come forward with any evidence, such as contracts or agreements with the Local Hires, that would require the Court to deviate from a straightforward application of the unambiguous terms of the Master CBA.

### B. The Master CBA Applies to Union and Non-Union Employees of Blade Contracting

As set forth above, a plain reading of the term "employee" in the Master CBA would include all Blade Contracting employees who contributed to the Ingersoll Housing Project, including the Local Hires. However, Defendants refer to the Local Hires as "non-union employees" in their opposition, arguing that nothing is due under the Master CBA as to these employees because Plaintiffs "have no suffered no damages with respect to wages and benefits paid to the non-union employees with whom they have no relationship." ECF No. 57 at 7.

Defendants also have presented evidence that the Local Hires did not join the Mason Tenders Union as contemplated by the Master CBA. For instance, Defendants asked the Mason

---

[4] While Defendants improperly raise this argument for the first time in their reply, the Court may nonetheless exercise its discretion to consider it. *See In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) (internal citation omitted).

Tenders Union Shop Steward if the Union would sign up "local hires" to make them part of the Mason Tenders Union, but the Union indicated they would not sign them up. Joint SMF ¶ 66. Defendants also testified they never had any dealings with the Funds' office. Joint SMF ¶ 68. Accordingly, Defendants appear to argue that Blade Contracting had no obligation to pay contributions on behalf of the Local Hires because they were apparently non-union members. The Court disagrees.

As an initial matter, to the extent Defendants contend Plaintiffs lack standing, the Court rejects this argument. As Section 502 of ERISA makes clear, private civil actions, like this one, may be brought by unions, employees, beneficiaries, or the trustees who administer the plan against employers who are delinquent in making contributions. *See* 29 U.S.C. § 1132(a); *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 312–13 (2d Cir. 1990) ("ERISA Sections 502 and 515 clearly give a district court subject matter jurisdiction to hear an action brought by benefit plan trustees to enforce an employer's promise to make contributions."); *Laundry, Dry Cleaning Workers & Allied Indus. Health Fund, Workers United v. B & M Linen Corp.*, No. 10-CV-5075 (VB), 2012 WL 360652, at *3 (S.D.N.Y. Feb. 3, 2012) (noting that pursuant to 29 U.S.C. § 1132(a), "[p]rivate civil actions may be brought by unions, employees, beneficiaries, or the trustees who administer the plan against employers who are delinquent in making contributions.").

To be sure, the Master CBA provided that *all* employees of Blade Contracting shall become and remain members of the Union. ECF No. 51-2, Art. III § 1 (at PLAINTIFFS 0004). It also provided that the Mason Tenders Union will become the collective bargaining agent for all Blade Contracting employees. *Id.* at PLAINTIFFS 0002. But this does not itself support Defendants' argument.

Indeed, courts have had occasion to address this very issue. For instance, in *Demolition Workers Union v. Mackroyce Contracting Corp.*, the Court rejected the defendants' argument that they were not required to make contributions for non-union employees under a collective bargaining agreement. No. 97-CV-4094 (LMM), 2000 WL 297244, at *4–5. (S.D.N.Y. Mar. 22, 2000). In reaching that conclusion, the Court referred to an opinion from the Northern District of New York, which in turn cited an *en banc* opinion from the Sixth Circuit, *Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 318–19 (6th Cir. 1984).

As *Demolition* explains, the Sixth Circuit in *Kohn* articulated a variety of guiding factors. First, *Kohn* explained that the "presence in the [collective bargaining agreement] of a recognition clause designating the union as the exclusive bargaining agent for all employees indicates that fringe benefit contributions are required for both union and non-union members." *Demolition*, 2000 WL 297244, at *4. Second, *Kohn* observed the collective bargaining agreement defined employees by job classification, indicating all employees within those job classifications must be covered by the collective bargaining agreement, regardless of union membership. *Id.* Third, it found that the absence of any language in the collective bargaining agreement distinguishing between union and non-union employees indicates that it covered all employees. *Id.* Fourth, it explained that the union shop clause, which required the defendant's employees to maintain membership in the union, "have [sic] been construed to require only payment of union dues and not union membership." *Id.* It also noted that to equate employees covered by the agreement with union members would render the union shop clause superfluous.

The *Kohn* factors have been applied by other courts in this Circuit as well. *See, e.g., Rahm v. J. Hall, Ltd.,* No. 07-CV-0726 (LEK) (DRH), 2011 WL 1136465, at *4 (N.D.N.Y. Mar. 25, 2011) (collecting cases and noting several courts in this Circuit have found the *Kohn* Sixth

Circuit decision instructive); *Trustees of Loc. 807 Lab. Mgmt. Health & Pension Funds v. River Trucking & Rigging, Inc.*, No. 03-CV-3659 (JMA), 2005 WL 2290579, at *3 (E.D.N.Y. Sept. 20, 2005) (same). This Court will similarly apply the *Kohn* factors to the record before it.

The *Kohn* factors weigh in favor of construing the Master CBA as applying to both union and non-union employees. The Master CBA designated the Union as the exclusive bargaining agent for all employees. ECF No. 51-2, Art. I § 1 (at PLAINTIFFS 0002). The Master CBA defined employees by job classification—namely, laborers who perform "bargaining unit work" as defined in Article IV, which generally covers masonry, construction, and maintenance. ECF No. 51-2, Art. IV § 1 (at PLAINTIFFS 0005–06). The Master CBA similarly has a "union shop clause" requiring employees to maintain Union membership and pay certain fees. ECF No. 51-2, Art. III § 1 (at PLAINTIFFS 0004). The Master CBA also does not make any distinctions between union and non-union employees. And similarly, equating "employees" covered by the agreement with "union members" would render the union shop clause superfluous.

Accordingly, the Court construes the Master CBA as applying to union as well as non-union employees, thus requiring Blade Contracting to have made fringe contributions on behalf of the Local Hires.

## II.    The Master CBA Did Not Require Blade Contracting to Violate State or Federal Law

Having determined the Master CBA applies to the Local Hires, the next question before the Court is whether Blade Contracting would have violated Section 220 of the New York Labor Law by making contributions to the Funds rather than direct cash payments to the laborers. Section 220 instructs that laborers, workmen, or mechanics (here, the Local Hires) be paid prevailing wages in addition to supplemental benefits. N.Y. LAB. LAW. § 220 (McKinney 2024). As the New York Court of Appeals stated in *Matter of Action Elc. Contrs. Co. v. Goldin:*

> Under subdivision 3 of section 220 of the Labor Law, supplemental fringe benefits must be provided to such employees in accordance with the prevailing practices in the same trade or occupation in the locality within the state where the public work is located. This requirement will be fulfilled when employees are supplied with the cash equivalent of the cost of obtaining the prevailing benefits or by providing an equivalent benefits plan, or by a combination of benefits and cash equal to the cost of the prevailing benefits.

64 N.Y.2d 213, 218 (1984) (cleaned up). In short, contractors (like Blade Contracting) who undertake a public works project (like the Ingersoll Housing Project) must provide these employees with prevailing wages and supplemental benefits. Here, Blade Contracting claims they discharged that statutory obligation by paying the Local Hires directly in cash. As a result, Blade Contracting did *not* make contributions to the Funds pursuant to the Master CBA with respect to the Local Hires, even though they must make contributions for their "employees" who perform "covered work." Pls. 56.1 ¶ 30.

Defendants, relying on *Vandee v. Suit-Kote Corp.*, 173 N.Y.S.3d 805 (4th Dep't 2022), argue that any contributions to the Funds would not have directly, and fully, compensated the Local Hires, and accordingly would have violated Section 220. Mem. at 10–12. To be sure, nothing in Section 220 requires contractors to make *cash payments* to their employees to cover the supplemental benefits contemplated therein. A contractor "may provide supplemental benefits in any form or combination so long as the sum total is not less than the prevailing rate." *Chesterfield Assocs. v. New York State Dep't of Lab.*, 4 N.Y.3d 597, 600 (2005); *see also Matter of Action Elec.*, 64 N.Y.2d at 222. However, as *Vandee* makes clear, any contribution to a pooled trust or union fund which would result in a dilution of funds to prevailing wage workers does not satisfy Section 220:

> Due to the dilution of funds resulting from those funds also being paid to the nonprevailing wage workers, the employees who worked on the public works contracts would not receive the full wages they would be entitled to for their work on the public works project. Under that scenario, the contractor would clearly have

> failed to comply with Labor Law § 220 (3) (a), notwithstanding that the contractor paid the same amount in wages to a fund as it would have paid if the prevailing wage workers had been paid directly according to scale.

173 N.Y.S. 3d at 809. This is the same situation Blade Contracting faced: making contributions under the Master CBA for the work performed by the Local Hires would have meant payment into a pooled fund that included both prevailing and non-prevailing workers, such that the Local Hires would not have received the full value of their wages. Defendants therefore properly concluded that solely making contributions to the Funds would not have satisfied their obligations under Section 220.

However, this does not necessarily mean Defendants were absolved of their obligations under the Master CBA. Making contributions under the Master CBA for the Local Hires' work would not have required Defendants to *violate* the law, it merely would have failed to *satisfy* their obligations under Section 220. In other words, Section 220 would have *required* Defendants to make *further payments*, as necessary, to satisfy their obligations. Section 515 of ERISA unambiguously provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall . . . make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. And contractors may discharge their Section 220 obligations through cash, benefits, or any other combination so long as the prevailing wage workers get the full value of their benefits. *Chesterfield*, 4 N.Y.3d at 600; *Vandee* 173 N.Y.S.3d at 808 ("That purpose is not served unless prevailing wage workers are fully compensated, in cash or otherwise, for any shortage . . . ."). By failing to make these contributions, Blade Contracting disregarded its obligations under the Master CBA.

20

In short, Defendants entered into the Master CBA to make fringe benefit contribution payments on behalf of all its employees. Defendants have not created a dispute of fact that the Local Hires were also employees within the meaning of the Master CBA. While direct cash payments to the Local Hires may have been well-intentioned, Blade Contracting's obligations under the Master CBA are not excused on that basis alone, and it is not inequitable to hold it to the agreement it bargained for. *See Miller v. Cont'l Ins. Co.*, 40 N.Y.2d 675, 679 (1976) ("[T]he usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public policy."). Indeed, Defendants' argument—that they have discharged their Master CBA and ERISA obligations by paying certain employees in cash—has already been rejected by courts in this Circuit. *See, e.g.*, *Buffalo Laborers' Welfare Fund v. MCS Remedial Servs., Inc.*, No. 06-CV-101C, 2008 WL 905917, at *3–4 (W.D.N.Y. Mar. 31, 2008).

### III.   The Doctrines of Waiver & Equitable Estoppel Do Not Apply in Section 515 ERISA Actions

Defendants invoke the doctrines of waiver and equitable estoppel to dismiss Plaintiffs' claims. Defendants argue that Plaintiffs, through the Union's Shop Steward who worked on the Ingersoll Housing Project, knew of the allegedly breaching conduct—namely, not making fringe benefit contributions for the Local Hires—but did not file any grievances or objections at the time. Defs. Mem. at 17–22.

The Court, however, may summarily reject these arguments, because they would not permit dismissal of claims pursuant to ERISA even if successful. The Second Circuit has recognized that an employer's affirmative defenses in a Section 515 ERISA action are limited. *See Benson v. Brower's Moving & Storage, Inc*., 907 F.2d 310, 314 (2d Cir. 1990) ("Our research has disclosed only two defenses recognized by the courts: (1) that the pension contributions

themselves are illegal, and (2) that the collective bargaining agreement is void (not merely

voidable).") (citations omitted); *see also Trustees of New York City Dist. Council of Carpenters*

*Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educ. &*

*Indus. Fund v. M.C.F. Assocs., Inc.*, 530 F. Supp. 3d 460, 466 (S.D.N.Y. 2021) ("The Second

Circuit has recognized two equitable defenses that can be raised against an ERISA claim brought

under Section 515 . . . ."). These defenses are limited because "once an employer knowingly

signs an agreement that requires him to contribute to an employee benefit plan, he may not

escape his obligation by raising defenses that call into question the union's ability to enforce the

contract as a whole." *Id.* (citing *Benson*, 907 F.2d at 314).

Here, Defendants have not attempted to argue the Master CBA is void. And as already

discussed, the portion of the Master CBA requiring Defendants to make fringe benefit

contributions did not "violate" Section 220 of New York Labor Law. Defendants do not

otherwise allege or argue any illegalities in the Master CBA. Accordingly, Defendants have not

substantiated any affirmative defense to bar application of ERISA.

### IV.    Blade Contracting and Blade GC Can Be Jointly and Severally Liable as a Single Entity

Plaintiffs argue that Defendants are joint and severally liable for Blade Contracting's

unpaid contributions (and interest) under the Master CBA because they essentially function as a

single entity.

A collective bargaining agreement binding on one employer may be enforced against a

non-signatory employer if (1) the two employers constitute a "single employer" and (2) the

employees of the companies constitute a single appropriate bargaining unit. *See Brown v.*

*Sandimo Materials*, 250 F.3d 120, 128 & n.2 (2d Cir. 2001). "[T]o determine whether two

companies qualify as a single employer, the Court considers four non-controlling factors: '(1)

interrelation of operations, (2) common management; (3) centralized control of labor functions and (4) common ownership.'" *Mason Tenders Dist. Council of Greater New York v. Phase Constr. Servs., Inc.*, No. 14 CV-6016 (ER), 2019 WL 95562, at *9 (S.D.N.Y. Jan. 3, 2019) (quoting *Brown*, 250 F.3d at 129 n.2).

Alternatively, the "alter ego" theory may similarly allow enforcement of a CBA against a non-signatory. "The test of alter ego status is flexible, allowing courts to weigh the circumstances of the individual case, while recognizing that the following factors are important: whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010 (cleaned up) (internal citation omitted).

Plaintiffs have carried their burden in demonstrating Defendants can be considered a single entity under either theory. Blade Contracting and Blade GC use the same third-party payroll processing company, share common yard space and office space, and occasionally share employees. Joint SMF ¶¶ 16–20. Indeed, Blade GC employees perform work for Blade Contracting construction projects. *Id*. ¶ 20. Also, James Lerie (of Blade GC) appeared on behalf of both entities for a deposition. *Id.* ¶¶ 7–9. And Lerie was a field supervisor for Blade GC and would also act as a field supervisor for Blade Contracting's new construction projects. *Id.* ¶¶ 13–14. Blade GC also entered into contracts for the benefit of Blade Contracting. For instance, Blade GC was the signatory to the Outlets PLA for the Outlets Project (*id.* ¶ 29), and related to this project, Blade Contracting entered into a subcontract with Empire Builders LLC to perform work on the Retail and Garage Sectors of the Outlets Project. *Id.* ¶¶ 33–34.

Defendants have essentially conceded this point, given that they fail to seriously engage with or address any of Plaintiffs' arguments that they are a single entity under either the "alter ego" or "single employer." ECF No. 57 at 6. Defendants admit they have jointly defended this action, *id.,* and merely interpose one sentence, in their opposition, that the companies "are separately registered . . . have separate addresses, and engage in separate type activities" without any further specification of what those activities are. ECF No. 57 at 6. These conclusory assertions are insufficient to create a dispute of fact to stave off summary judgment. *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . .") (cleaned up). And in any event, Defendants have not adduced any evidence to create a dispute of material fact with respect to this issue.

## V.    Available Damages

Having determined Blade Contracting did not satisfy its obligations under the Master CBA, and because Defendants can be held jointly and severally liable for the delinquency, the final question for the Court is damages.

Plaintiffs in Section 515 cases may recover (i) interest on the unpaid contributions; (ii) liquidated damages; and (iii) reasonable attorney's fees and costs. 29 U.S.C. § 1132(g)(2)(A)-(D). The applicable interest rate is provided by the governing agreement. *Id.* § 1132(g)(2). Section 502(g)(2) of ERISA also states where "judgment in favor of the [fund] is awarded, the court shall award the [fund]" the unpaid contributions, interest on the unpaid contributions, liquidated damages, reasonable attorneys' fees and costs, and other legal or equitable relief the Court deems appropriate. 29 U.S.C. § 1132(g). "Costs" include auditor fees if provided for in the CBA. *Trs. of Four Joint Bds. Health & Welfare & Pension Funds v. Penn Plastics, Inc.*, 864 F. Supp. 342, 350-51 (S.D.N.Y. 1994); *accord Trs. of the Operating Eng'rs Loc. 137 v. WJL*

*Equities Corp.,* No. 14-CV-2640 (VB), 2016 WL 1369547, at *3 (S.D.N.Y. Apr. 6, 2016). The statute also permits liquidated damages up to the greater of (i) the interest on the total unpaid contribution or (ii) a percentage of the unpaid contribution set forth in the CBA not to exceed 20%. 29 U.S.C. § 1132(g)(2)(C).

Here, Plaintiffs have asserted that they are entitled to the remaining Blade Audit delinquency amount of $150,731.57 in unpaid fringe benefit contributions; $61,205.29 in interest that has accrued on that amount, with interest continuing to accrue until entry of judgment; $61,205.29 in liquidated damages for the unpaid contribution delinquency; imputed audit costs in the amount of $79,770.29; and reasonable attorneys' fees and costs, in addition to any other relief this Court deems just and equitable. Pls. Mem. at 24.

However, Defendants have correctly objected to any payment for unpaid contributions as to work occurring prior to 2017, because any such conduct is time barred. "ERISA does not provide a statute of limitations for civil enforcement actions, so the most similar state statute of limitations applies to most ERISA claims, and a court looks to federal common law to determine when the cause of action accrues." *Bilello v. JPMorgan Chase Ret. Plan*, 607 F. Supp. 2d 586, 592 (S.D.N.Y. 2009) (citing *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007)). The statute of limitations for ERISA actions brought under 29 U.S.C. § 1132(a)(1)(B) in New York is six years, inferred from the statute of limitations for contract actions set by Section 213 of the New York Civil Practice Law and Rules. *Id.* Therefore, Plaintiffs' ERISA claim is barred to the extent that it is based on conduct that occurred prior to November 10, 2016, which is six years before they commenced this action.

The Blade Audit period began with January 1, 2016, and therefore Plaintiffs' reported damages must exclude any alleged unpaid contributions from prior to the November 10, 2016

date. Plaintiffs have offered no evidence indicating their current claimed damages have accounted for this issue. Accordingly, Plaintiffs must submit a proposed judgment for itemized damages, fees, and costs consistent with ERISA and the Master CBA to account for this deduction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part, and Defendants' motion for summary judgment is DENIED. Plaintiffs shall submit (i) substantiation for Plaintiffs' requested attorneys' fees and costs, which shall include contemporaneous billing records documenting, for each attorney, the date, the hours expended, and the nature of the work done; and (ii) a proposed judgment stating a total amount owed by Defendants, which shall include itemized monetary relief for unpaid benefit contributions, accrued interest, liquidated damages, and any other relief permitted by ERISA and the Master CBA, plus the final amount of attorney's fees and auditor fees requested, on or before **April 30, 2025.** Defendants may submit an opposition by **May 14, 2025,** and Plaintiffs may file a reply by **May 21, 2025.** Defendants may also include in their opposition any good faith, reasonable objections to the revised proposed judgment and Plaintiffs' requested fees and costs. Any such objections shall not contest the fact of Defendants' liability.

The Clerk of Court is respectfully directed to terminate ECF Nos. 49 and 56.

Dated:  March 27, 2025
        New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge